reconstruction. As I'll discuss, the board plucked various elements from the prior art going back to the 12 years before the filing date of this patent and combined it through the prism of the claimed invention. The fact is, and this is undisputed, is that Packers Plus' stack frac system and the method of using it that they came out with in the early 2000s was the first open hole multi-stage fracturing system in the world. Weatherford has not pointed to any commercial example of an open hole multi-stage fracking system that was out there prior to stack frac. Well, a reference doesn't have to be commercial to be a reference for obviousness. Yes, Your Honor. I'll agree with that. When I discuss YOST, I'll talk about that we're not saying YOST is not, shouldn't be considered just because it's an experimental reference, but there are other design criteria that were attended with YOST that render it as one that should not be considered in the in the obviousness combination. There were, at the time that Packers Plus came out with stack frac, various competitors have been in the industry for decades. Baker Hughes, Halliburton, Weatherford, there's a slew of them. They have vast resources, vast knowledge about the oil and gas field, drilling, completions. Nobody before Packers Plus had come up with the open hole multi-stage fracturing system that Packers Plus did in stack frac. Stack frac was invented by Mr. Daniel Thiemig, who was the founder of Packers Plus. What about the, I mean, I have to be honest, this sort of general argument is kind of a waste of time. You got 15 minutes, so just get to the evidence on motivation to combine. What in particular is lacking? We review this, it's a question of fact, for substantial evidence in this case. We don't get a de novo review. In addition to the evidence that's discussed expressly from YOST, Thompson, and Ellsworth, you have Mr. Traham, the Packers Plus expert, who testified in a previous litigation, but that was submitted to the board and is part of the evidence of record here, that cased hole tools had been used in open hole completions for many years. Why isn't that part of the substantial evidence that motivates one to combine these two technologies? Your Honor, we admit that the elements, the physical structure elements in the claimed invention were present in the prior order. Our position is that the claimed method of using these elements for open hole fracturing was not. With respect to motivation, the YOST reference, which seems to be the primary reference that Weatherford is relying on, was a 1989 experiment that the government did to figure out how it can increase U.S. oil reserves. And it had an open hole completion system where they were running multiple stages, multiple frac jobs per stage, to figure out what particular criteria would yield the best results. They were not multi-stage fracking for any sort of commercial purpose. They were trying to see how can we get the most oil out of the ground, out of the formation. YOST then realized, the same YOST well that the YOST paper is about, later was discovered to have problems in terms of it wasn't isolating its zones. And our expert, Mr. McGowan, as we pointed out in our appellate brief, pointed to a reference that the Department of Energy published that said, look, we were experiencing leaking between the zones in the YOST well. The fact that you are having this failure in zonal isolation suggests that you were not, your multi-stage fracking was going to be compromised because you were losing pressure among your zones and you weren't going to be able to perform optimal multi-stage fracturing. And our expert said, in view of that, if you're having this leakage between the zones, that would guide one of our new scale in the arc to go back to cemented plug-and-perf fracturing. And that's what the Department of Energy did. After the YOST well, after they ran these experiments in 1989, they went back in later wells and used cemented plug-and-perf operations. Moreover, the Kim and Abbas paper that Weatherford relies on, which did some testing on stone in a lab to see what kind of fracturing would work best, found that, hey, look, I looked at the YOST reference and in 1995, the Abbas author said, cementing was essential when you're doing horizontal well completions. So even after he was aware of the YOST reference, he's the author on the Kim and Abbas reference that Weatherford cites, they went back in the mid-90s and said, hey, look, cemented plug-and-perf is the way to go. The 1997 paper, Thompson, which Weatherford relies on, similarly, it's about cemented casing. So there was some testing on open hole systems back in the late 80s and early 90s, but industry didn't adopt it. Industry went away and stuck with what they were comfortable with. Isn't that, am I remembering right, just tell me if I'm not, that there was evidence in this record, and maybe the board also relied on this evidence, two separate matters, obviously, to the effect that this is an industry that needs an extra special showing to change its behavior, even though it recognized something as technologically possible. I think the summary was it's a very conservative industry in the relevant sense. Right, there is evidence to that. So doesn't that legitimately permit the finder of fact to discount the kind of real world, nobody was doing this for a long time, evidence? I don't think so, Your Honor. As we pointed out in our briefs, there were failures in Yoast. One skilled in the art looking at what Yoast achieved would realize, look, this wasn't economically feasible to do on a commercial scale. Mr. McGowan, our expert, said if you look at the production increase that Yoast achieved with his open-hole simulations, it was equal to what you would get if you drilled a horizontal well in a naturally pressured formation. So one skilled in the art looking at this would say, okay, I see you tried open-hole. You got the same production that I would have got if I just drilled a hole without fracturing. Why would I go away from plug-and-perk where I could specifically control, precisely locate where the fractures are going to be? So, Your Honor, I would suggest that, yes, this industry is sort of slow to change, but once something is discovered, once something novel has come out that changes how much money you're going to make, how much oil you're going to get out of the ground, companies quickly adapt to it, which is exactly what happened here when Packers Plus came out with StackFrack. Baker Hughes copied it. Weatherford, Halliburton, Schlumberger, they all had systems, open-hole systems predicated on the StackFrack design. And the board found that. The board found copying. The board found industry praise. What the board did not find was commercial success. And our view is that the record evidence shows that Packers Plus made hundreds of millions of dollars annually. The vast majority of it— I thought that—tell me if I'm wrong—that what the board said about this is, yeah, there's some commercial success, but we don't really know how much credit, how much weight to give that, in part because your best evidence is that in a particular formation, your system was now being used for something over 50 percent. But if you look at the industry as a whole, it's not quite that impressive, and we don't know, roughly speaking, what the denominator is of your several hundred million dollars. Right. The board was concerned that it didn't have evidence with regard to market share. Yeah. Right. But I would submit, and we cited the TechAir case, Your Honor, that evidence of market share isn't dispositive as to whether there was commercial success. Right. But all the board is doing is saying, we recognize a bunch of things that actually point in your favor, but we're considering the whole package, including the strength of the prior art and what's missing from the objective indicia evidence, though we quite credit some of it, like the copying and some amount of success tied to your method. But on the whole, we don't think it changes what we would otherwise conclude from looking at the art. Your Honor, as we argued, we don't think the board properly credited Packers Plus' commercial success with StackFrack. The evidence is clear, even if you do the math conservatively, that Packers Plus made hundreds of millions annually on StackFrack. That's a considerable amount of money. That's commercial success. In the PPC broadband case, this court found that $50 million was sufficient. Isn't there a kind of Dirksen principle here? $100 million may not actually be real money? Well, you said the board needed to look at everything, the whole picture. And if you look at it with the industry praise that Packers Plus received for StackFrack, where companies were saying, hey, look, this put Packers Plus on the map. It became the darling of the industry. It changed the industry. It's hard to not tie that to the commercial success of StackFrack. And I would submit to Your Honor that a reasonable mind would not come to any conclusion other than StackFrack was commercially successful. The board didn't come to that conclusion. And it's a little bit of a puzzle because it found all this industry praise. It found copying. But then it said, even despite the numbers into the hundreds of millions of dollars, that it couldn't really give proper credit to commercial success. And I would submit, Your Honor, that commercial success, with the other secondary considerations that the board found, actually guide toward a fighting of non-obviousness over the motivation that the board found for obviousness. With respect to, there's an issue about whether Packers Plus, I'm sorry, Rapid Completion should have gotten an opportunity to respond to the Kim and Emboss paper and the McClellan paper. If you look at the final written decision of the board, for example, on pages 56 and 57, when they're talking about the motivation that they believe was there to combine the references or why one of ordinary skill in the art would have looked to an open whole system. The sites to those conclusions are the Kim and Emboss and McClellan papers. But those are not part of the invalidity grounds that Weatherford relied on in their petition. We asked to be able to respond to those, and the board denied us from being able to provide expert testimony on those references. In addition to the substantive issues with the references, we think it was an abuse of discretion for the board to have considered those references, not as supplemental evidences, but they were the motivating references that the board looked at in their motivation to combine analysis. We believe that was improper. At minimum, this case should be remanded with instructions that we'd be allowed to further brief the Kim and Emboss and McClellan papers. There's also, with respect to the open whole references that Weatherford relies on, there seems to be sort of a sleight of hands in that we're not claiming that we invented fracturing in open whole horizontal wells. What the claim is about is performing a multistage fracturing procedure in an open whole. And there seems to be this assumption that, well, if you knew how to frack in a horizontal well, then that means that it would have been obvious to do multistage fracking. Aside from the fact that nobody did it before as Packers Plus, it was not technically obvious to do that. Because of the zonal isolation problems, for example, that Yost experienced. It was Packers Plus that came up with the idea, well, how can we achieve zonal isolation to make multistage fracturing in open whole work? And what do the claims identify as the answer to the how question? It's the how of how they – well, if you look at Claim 1 of the 774 patent, it talks about how you have the Packers where the wellbore annular segments are isolated. It specifically says that. So the solid body Packers alongside each of the sliding sleeves – I thought early in this argument you said, acknowledged, whatever the right term is, that the equipment itself is not different from what you would find in the prior art, only the method of using it without cement casing. The use of the solid body Packers to do open whole multistage fracking was novel. That was not done. What was done in Yost, they had inflatable Packers that were alongside the stages, and that's why they experienced the zonal leakage, which Mr. McGowan talked about. Council, we are well into your rebuttal time. We'll give you two minutes rebuttal. Thank you. Mr. Wilson. Thank you, Your Honors. The evidence of obviousness here is overwhelming. There were two grounds for obviousness, one starting with Yost. Yost was a multistage open whole fracturing operation. It required only two simple substitutions that were expressly disclosed in both Thompson and Ellsworth. To achieve the claimed invention, ground two started with Thompson, which is the entirety of the structural limitations of their claims. In a single system, the only thing that Thompson lacked was performing the method disclosed in Thompson in open whole. And as Your Honors pointed out earlier, Appellant's own expert admitted that using case-told tools in open whole was known and obvious and could not be a basis for patentability. We think the obviousness case here is overwhelming. So was the admission that you just referred to something other than the very general statement that, of course, some, maybe even many, tools used in cemented holes can be used in uncemented holes? But I think when I'm remembering, I guess, and tell me if I'm wrong, when I went and looked at that testimony, it doesn't say, every single tool you use in a cemented hole, you can use in an uncemented hole. In which case, there could really be invention involved in saying, this particular tool, which nobody had really thought to use in the uncemented hole, we should do that. I don't recall exactly whether it says what Your Honor is asking. However, what it does say is that solid body packers, in particular, can be used for isolation in open hole. That was, in fact, the specific subject matter in which the general statements were made. So that's the only part of the Thompson apparatus. And that's the zone isolating feature? Correct, Your Honor. That's the only part of the Thompson apparatus that cares, whether it's in a cased hole or open hole, because it's the only part of the apparatus that actually touches the weldable wall. So that was the only issue. The only issue is, can you use those solid body packers that are in Thompson in open hole? Ellsworth says you can, and you can use them for stimulation. And their experts, Appellant's own experts, admitted that, yes, it was known to use these solid body packers in open hole. So that's really the only issue in getting from Thompson to the challenge claims. So those are the 774 claims. And if we back up and talk about the 634 and 505 claims, which Appellant's counsel didn't mention, those claims are not limited to fracturing. Now, our contention is that they have waived any argument on the 634 and 505 claims because it was not listed as an issue to be decided by the court on appeal. They provided merely a footnote saying whatever arguments we make for 774 also apply to 634 and 505. That's incorrect because the 634 and 505 claims are not limited to fracturing, and counsel for Appellant's admitted before the board that their case is much weaker in that respect, especially when it comes to the secondary consideration evidence, and you'll find that at JA 1560 to 1561, which is the transcript of the board hearing, where counsel for Appellant's admitted that the evidence of praise was focused on fracturing. So, for example, that evidence would not be as compelling in the 634 and 505 claims. Can you say something about Mr. Qureshi's point that there was some kind of process problem, procedural problem, notice problem, whatever, process problem as a generic descriptor, with respect to the board's use of Kim and Abbas and McClellan? Certainly, Your Honor. So what happened before the board is we put forward our case of obviousness. There's really no dispute about the motivations to combine, which are expressly in Yost, Thompson, and Ellsworth, whether you start with Thompson and use Appellant's admissions or whether you start with Yost, which expressly discloses open-hole multistage fracturing. What they tried to do then was to come back and say, despite Yost's disclosure of open-hole multistage fracturing, a person of ordinary skill in the art would not have used open-hole multistage fracturing because they would have been afraid of it. And we cited Kim and Abbas in response to that as rebuttal points to say, it was well within the knowledge of a person of ordinary skill in the art to do open-hole multistage fracturing. Not just Yost discloses that. Here's a couple of additional examples that prove that people were not afraid of open-hole multistage fracturing. That's all those references were cited for. Just like in the Genzyme versus BioMarin case, those references were legitimately cited as rebuttal evidence. They had an opportunity to respond. The board didn't even cite any of those references in its motivation to combine discussion. My review of the board's opinion was the only time either of those references were mentioned was in the secondary consideration discussion. Am I mistaken? So I believe the board cited those, at least Kim and Abbas, at appendix pages 53 to 54. The reasonable expectation of success part. That's correct, Your Honor. All right. Got it. Yes. Yep, I remember that now. But yes. Okay, thank you. Yes, the grounds, ground one and ground two, were the same throughout the proceeding. There was no APA violation here. The grounds that the board relied on for obviousness, both grounds, were the same as the grounds presented in the petition. Those references were merely submitted as rebuttal evidence to the appellant's own argument. How are they rebuttal evidence to the appellant's own argument as opposed to additional evidence supporting yours? I don't understand. So the motivation to combine that we relied on and that the board relied on was, in fact, found in Yost, Thompson, and Ellsworth and in the appellant's own expert admissions that open hole, the use of case hole tools in open hole was known in the art. Again, they tried to rebut that showing by saying, despite all of that, let's assume that all that's true, a person of ordinary skill in the art would have been afraid of open hole multistage fracturing. McClellan and Kim and Abbas were cited to rebut that. In fact, they showed, they talked about, for example, complex fracture geometries. Kim and Abbas says fracture initiation is the same in case hole and open hole, and in fact, open hole is preferred in that regard. So it was rebuttal evidence. So I think I've spoke about motivation to combine. The board's findings of motivation to combine are supported by substantial evidence. They're expressly disclosed in the references, as I've discussed. Moving on to the secondary considerations, the board found no commercial success. They found no long felt but unmet need and no defying of conventional wisdom, as well as no unexpected results. All of those findings are supported. They found what, industry praise and competitor copying. That's correct, Your Honor. They've said there was a modicum of evidence of industry praise and copying, and that that evidence was outweighed by what the board termed the elements of the claims being readily discussed and applied in a variety of oil and gas industry prior art, including open hole multistage completion. And that's a Joint Appendix 56. And we submit that the board was legally correct in that respect and that its findings are supported by substantial evidence. It may not affect the ultimate weighing, but why was the board not clearly erroneous on the question whether there was commercial success? So, I believe the correct standard is substantial evidence, and I believe the board's opinion. Okay, sorry about that. Yes, you're right. No problem. So, but I believe the board's opinion was supported by substantial evidence, and here's why. If you look at, there were three aspects to their commercial success argument. First was Packers Plus sales. The board said, what you have failed to do is to tell us, you've got an apparatus, fine, stack frack. Stack frack looks exactly like Thompson. It is Thompson, right? Thompson anticipates the stack frack. Your claims are method claims that require use in a horizontal open hole well. What you have failed to do is show us how much of those sales were performed in a horizontal open hole well. Those tools can be used in case toll. They can be used in vertical wells. It was your burden to show the use of those tools. They failed to present any evidence of that use. The same is true of the Baker Hughes sales data that they provided, which is far weaker, and they had no Weatherford sales data. On top of that, the Baker Hughes sales data and Weatherford sales data really have no use at all. Baker Hughes was a number of frack sleeves, and Weatherford was a percentage of open hole completions that the board said you provided no evidence of what's encompassed within that. You mean what equipment was being used? Yes. So as we argued to the board, Weatherford used, for example, swillable packers, which the board found were not solid body packers. There's no challenge to that finding here. So I submit that the board's findings on commercial success are supported by substantial evidence. And if there are no further questions, I'll cede the rest of my time.  Thank you, Your Honors. Karoshi has a couple of minutes for rebuttal. Your Honor, on that last point, the board did not rule that swill packers could not be a type of solid body packer. In the claim construction section of the final written decision, all the board said is that there's an agreement between the parties that solid body packers don't cover inflatable packers, and not say swill packers. With respect to ground two, the Thompson-Ellsworth combination, Thompson, we've discussed, was a cemented application. Ellsworth, which is what Weatherford relies on to bring in the open hole aspect to the combination, is not even about hydraulic fracturing. It's about making sure water in one zone doesn't get into another zone when you're actually recovering oil and gas from a well. It's not about fracturing at all. So, as we argued in our briefs, there's no motivation to combine the cemented Thompson reference with the reference that's not even about fracturing. With respect to the Kimmon and Boss and McClellan papers, the board did just cite to those papers for motivation, and in their discussion of the level of ordinary skill in the art. I just looked at it, it's on page 46, where they say it would have been obvious for one skilled in the art to consider open hole completions, and then it simply cites the Kimmon and Boss paper, which we were not able to respond to via expert testimony. Moreover, the Kimmon and Boss paper was about doing fracturing tests in a lab on a 100 millimeter by 200 millimeter by 100 millimeter-ish piece of stone. It was not an application in an actual formation. With respect to the commercial success, the exhibit, the documents we cited for industry praise specifically talk about stack frack being used in a horizontal well. That's what made stack frack an industry game changer, is that it was being, we were able to do multi-stage fracking in a horizontal well, stack fracking. In conclusion, your honors, I would ask that the court reverse the board's decision or at least vacate the decision with further instructions to the board. Thank you. Thank you, counsel. The case is submitted.